******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
CHRISTOPHER CARRION
(SC 18960)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Vertefeuille, Js.

*Argued September 25, 2013—officially released September 30, 2014*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy Sedensky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Christopher Carrion, guilty of four counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and four counts of risk of injury to a child in violation of General Statutes (Rev. to 2005) § 53-21 (a) (2).[1] The trial court rendered judgments in accordance with the jury verdicts,[2] and the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly had (1) permitted the state, under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986),[3] to use a video recording of a forensic interview of the child victim, D.L.,[4] for substantive purposes, despite the highly suggestive manner in which the interview was conducted, and (2) instructed the jury that the state does not want the conviction of an innocent person as it is as much concerned in having an innocent person acquitted as in having a guilty person convicted. *State* v. *Carrion*, 128 Conn. App. 46, 48, 57, 16 A.3d 1232 (2011). The Appellate Court rejected the defendant's first claim, concluding that the trial court reasonably determined that the video recording of D.L.'s interview was admissible under *Whelan* notwithstanding any flaws in the manner in which the interview was conducted. See id., 53–54. With respect to the second claim, the Appellate Court declined to address its merits because, the Appellate Court concluded, the defendant implicitly had waived his right to raise the claim under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).[5] *State* v. *Carrion*, supra, 60–61. We granted the defendant's petition for certification to appeal, limited to two issues. First, "[u]nder the circumstances presented, did the Appellate Court properly conclude that the trial court reasonably [had] permitted the state to introduce as substantive evidence a [video-recorded] interview of [D.L.] . . . under [*Whelan*]?" *State* v. *Carrion*, 304 Conn. 925, 41 A.3d 1052 (2012). Second, "[d]id the Appellate Court properly conclude that [defense counsel] had a meaningful opportunity to review the trial court's final jury instructions and therefore [knowingly and intentionally] waived [the defendant's] unpreserved claim of instructional impropriety under [*Kitchens*] . . . when defense counsel did not receive those instructions until immediately prior to the lunch break on the day that the court instructed the jury, thereby affording counsel only one hour to review the instructions?" Id. Thereafter, the state claimed, as an alternative ground for affirmance,[6] that, even if the defendant did not waive his right to challenge the jury instruction at issue, that instruction was not improper. With respect to the evidentiary issue, we agree with the Appellate Court that the trial court did not abuse its discretion in admitting into evidence, for substantive purposes, the video recording of D.L.'s forensic interview. With respect to the defendant's claim of instructional impro-

priety, even if we assume, without deciding, that the defendant's claim of instructional impropriety was not implicitly waived under *Kitchens*, we conclude that the challenged instruction, when viewed in the broader context of the charge as a whole, did not deprive the defendant of a fair trial. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts that the jury reasonably could have found. "From January, 2005, to March, 2007, the defendant lived with his parents in [the town of] Prospect, and D.L. lived with her parents and siblings in [the city of] Waterbury. During this time, the defendant and D.L. regularly spent time together, as the two were cousins whose families would often gather [for] holidays, parties and other family occasions. On March 25, 2007, D.L., who was then seven years old, revealed to her mother . . . that the defendant previously had sexually abused her during visits in both Prospect and Waterbury. Soon thereafter, [D.L.'s mother] informed detectives of the Waterbury [P]olice [D]epartment of [D.L.'s] revelations, and a formal investigation of the alleged abuse was initiated.

"On April 9, 2007, D.L. underwent a forensic interview [conducted by Jessica Alejandro, a forensic interviewer affiliated with the Child Guidance Clinic of Greater Waterbury, Inc.], during which [D.L.] recounted in detail the nature of the defendant's sexually abusive behavior. This interview was [video-recorded] in its entirety, and the substance of D.L.'s statements during the interview were later confirmed by the defendant himself in a voluntary statement that he made to Waterbury police detectives on May 18, 2007. Additionally, on May 21, 2007, D.L. underwent a physical examination that corroborated further her account of the defendant's sexually abusive behavior.

"[When confronted with D.L.'s allegations, the defendant confessed to having had vaginal intercourse and oral sex with D.L. He then] was arrested and charged in two separate informations with four counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), four counts of risk of injury to a child in violation of § 53-21 (a) (2) and two counts of risk of injury to a child in violation of § 53-21 (a) (1)." (Footnote omitted.) *State* v. *Carrion*, supra, 128 Conn. App. 48–49. The informations were consolidated, and a jury found the defendant guilty of four counts of sexual assault in the first degree and four counts of risk of injury to a child.

On appeal to the Appellate Court from the judgments of conviction, the defendant claimed that the trial court improperly had permitted the state to introduce into evidence the video recording of D.L.'s forensic interview for substantive purposes because the statements made by D.L. in that interview were "grievously unreliable" within the meaning of *State* v. *Mukhtaar*, 253 Conn.

280, 306–307, 750 A.2d 1059 (2000).[7] *State* v. *Carrion*, supra, 128 Conn. App. 49–50. The Appellate Court rejected this claim, concluding that, although, in some respects, the interview may not have comported with certain standards for interviews of child sex abuse victims, "there [was] nothing so unduly coercive or extreme about the circumstances of D.L.'s interview that would serve to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of D.L. herself." (Internal quotation marks omitted.) Id., 53. For this reason, the Appellate Court concluded that the trial court did not abuse its discretion in permitting the state to use the video recording for substantive purposes. Id., 53–54.

The defendant also claimed that the trial court improperly had instructed the jury that "[t]he state . . . does not want the conviction of an innocent person . . . [as] [t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted." (Internal quotation marks omitted.) Id., 57. Relying on *State* v. *Kitchens*, supra, 299 Conn. 482–83, the Appellate Court determined that the defense implicitly had waived this unpreserved instructional claim.[8] *State* v. *Carrion*, supra, 128 Conn. App. 60, 61.

On appeal to this court following our grant of certification, the defendant claims that the Appellate Court incorrectly concluded, first, that the trial court did not abuse its discretion in overruling defense counsel's objection to the state's use of the video recording of D.L.'s forensic interview as substantive evidence of the defendant's guilt and, second, that the defense implicitly waived the defendant's right to raise a claim on appeal challenging the trial court's jury instruction that the state wants to see an innocent person acquitted no less than it wants to see a guilty person convicted. We reject the defendant's evidentiary claim for the same reasons on which the Appellate Court relied, and, with respect to his claim of instructional impropriety, we conclude that the challenged instruction, viewed in light of the instructions as a whole, did not violate his constitutional right to a fair trial.[9] Accordingly, we affirm the judgment of the Appellate Court.

I

We first address the defendant's contention that the trial court incorrectly concluded that the video recording of D.L.'s forensic interview was admissible for substantive purposes. The defendant asserts that Alejandro's questioning of D.L. was so leading and suggestive that D.L.'s statements in response to that questioning were wholly untrustworthy and, therefore, inadmissible for substantive purposes under *State* v. *Mukhtaar*, supra, 253 Conn. 306–307. See footnote 7 of this opinion. In support of this assertion, the defendant contends that Alejandro's questioning of D.L. violated accepted standards for conducting a forensic interview

of a child sexual abuse victim. According to the defendant, these improprieties included Alejandro's: (1) repeated use of leading questions; (2) use of anatomically correct dolls in a suggestive manner; (3) act of informing D.L. that a social worker and two police officers were observing the interview; and (4) failure to validate D.L.'s statements. Although the state acknowledges that Alejandro utilized one or more arguably improper techniques during the course of her interview with D.L., it maintains that the Appellate Court correctly determined that the trial court reasonably had permitted the state to use D.L.'s statements for substantive purposes because those statements contained numerous indicia of reliability, in particular: (1) D.L. made multiple spontaneous statements concerning the sexual abuse; (2) she sometimes corrected Alejandro; and (3) she provided details of her abuse, including the identity of the defendant, in response to nonleading questions. We agree with the state.

The following additional facts and procedural history are necessary to our resolution of the defendant's claim. Alejandro began the interview of D.L. by asking her general questions about school, and her pets and siblings. Next, Alejandro explained that their conversation was being recorded and that a social worker and two police officers were watching from the other side of a one-way mirror. Alejandro also informed D.L. that she should feel comfortable correcting Alejandro at any time and confirmed that D.L. understood this instruction by asking, "[s]o you're in the second grade," to which D.L. responded "[n]o, first." Alejandro also instructed D.L. that, if she did not know the answer to a question, she should feel free to say so. In addition, Alejandro confirmed that D.L. understood the difference between a truthful statement and a lie, and D.L. expressed her understanding that people who tell lies "can get in trouble."

Thereafter, in response to a mix of leading, multiple-choice and open-ended questions, D.L. told Alejandro that the defendant did "something" to her multiple times over the previous few months. D.L., however, was reluctant to describe the details of the defendant's conduct, stating that the defendant had instructed her that he would "get in trouble" if she told anyone about it.

Following this exchange, Alejandro showed D.L. two anatomically correct dolls, one male and one female, and confirmed that D.L. could properly identify the dolls' various body parts. By reference to the anatomy of the female doll, Alejandro also elicited from D.L. that certain areas of the doll's body were "private parts" and that only D.L., her mother, or a physician was permitted to touch D.L. in those places. Alejandro then asked D.L. if she knew "someone [who] has a touching problem and touches those parts when they're not supposed to?" D.L. responded by identifying the defendant.

Next, Alejandro asked D.L. to point both to the places on the female doll where the defendant had touched her and to the places on the male doll that corresponded to the body parts that the defendant had used to touch D.L. For purposes of this portion of the interview, Alejandro almost always held the dolls upright and facing D.L. when questioning her, but Alejandro frequently would lay them on a table for D.L. to handle on her own before she answered Alejandro's questions. D.L. responded by pointing to different parts on the dolls while they were on the table or, in some instances, in Alejandro's hands. At one point, in response to Alejandro's inquiry as to where the defendant had touched her, D.L. pulled the female doll out of Alejandro's hands, flipped it over, and pointed to the buttocks. In response to Alejandro's questioning, and with reference to specific body parts, D.L. indicated that, on several occasions, the defendant had forced her to have vaginal intercourse and oral sex with him.

For the remainder of the interview, in response to a series of questions posed by Alejandro that were similar in form to the preceding questions, D.L. further described the circumstances surrounding her encounters with the defendant in the months preceding the interview. In addition, after D.L. revealed that the defendant's two brothers also had sexually abused her, Alejandro questioned D.L. regarding her interactions with the three men. Alejandro concluded the interview by asking whether D.L. had "anything else that [she] want[ed] to talk . . . about," and D.L. answered in the negative.

As the Appellate Court explained, "[p]rior to trial, the defendant filed a motion in limine seeking to preclude the state from admitting as evidence the [video-recorded] interview of D.L. In support of this motion, the defendant argued, inter alia, that the coercive nature by which D.L.'s description of the sexual abuse was procured rendered the . . . interview grievously unreliable and, therefore, inadmissible.

"[The trial court thereafter conducted] an evidentiary hearing . . . on the defendant's motion, during which the defendant presented the expert testimony of a clinical psychologist, David M. Mantell. Mantell testified that, in his professional opinion, 'the validity of the investigation techniques' used during D.L.'s interview were 'so seriously marked from the best practices that . . . they invalidate[d] the procedural integrity of the [entire] evaluation.' More precisely, Mantell criticized the 'suggestive techniques' utilized by [Alejandro] during D.L.'s examination . . . [which] he found 'produce[d] results of a questionable memory . . . .' "[10] *State* v. *Carrion*, supra, 128 Conn. App. 50.

Mantell did acknowledge, however, that Alejandro properly took some steps to reduce the potentially coercive atmosphere of the interview, including (1) ques-

tioning D.L. in a "child friendly environment," (2) conducting a rapport building phase of the interview, and (3) taking time to explain the general rules for the interview. Mantell also conceded that certain statements made by D.L. during the interview possessed the indicia of reliability. For example, Mantell recognized that D.L.'s willingness to correct Alejandro, along with D.L.'s spontaneous utterances and use of appropriate language for a child, indicated that her statements reflected what D.L. actually recalled and believed and were not merely the product of what she thought Alejandro wanted to hear. Furthermore, Mantell stated that, although Alejandro never specifically confirmed that D.L. understood that the dolls used in the forensic interview were intended to represent real people, children over the age of five or six usually do appreciate that fact. Finally, Mantell testified that, although the forensic interview protocol that he designed forbids the use of multiple-choice questions, another such protocol, the RATAC protocol,[11] permits the use of such questions.

At the conclusion of Mantell's testimony, the trial court denied the defendant's motion in limine. The court concluded that grievous unreliability "is a very high standard that might . . . be met in a case [in which] there was police misconduct and a statement was forcibly taken from a suspect . . . . But, here, we have a different situation, where a statement is taken in a clinical environment, and we have a seven year old girl who . . . ultimately told . . . her own story. Certainly, there is enough . . . for the jury to consider whether [it] should credit it or not, and the information and testimony [adduced] by the defendant is really more grist for the cross-examination mill than matter that goes to the admissibility of the statement. . . . Mantell's review, with the benefit of twenty-twenty hindsight and with a fine tooth comb, does show that some questions could be better worded or [that] the interview could be done in a better way, but not that the child's testimony was coerced. Some of this criticism—and I've reviewed it carefully—of the questions, I find to be somewhat picky or trifling. And any failure to . . . comply with protocols or prevailing standards does not necessarily connote grievous unreliability."

As the Appellate Court explained, "[d]uring the state's case-in-chief, D.L. testified as to the defendant's sexually abusive behavior; however, her testimony in this regard was often inconsistent with the details [that] she [had] provided during her [video-recorded] interview.[12] [In light of these inconsistencies], following D.L.'s testimony, the state [sought] to introduce the portions of the [video-recorded] interview that were inconsistent with D.L.'s trial testimony as substantive evidence pursuant to *State* v. *Whelan*, [supra, 200 Conn. 753], and § 8-5 of the Connecticut Code of Evidence.[13] In response, [defense counsel] argued that D.L.'s 'statement[s] [during the interview] were taken in such circumstances

that they undermine[d] the reliability of the statement[s]' and should be excluded under *State* v. *Mukhtaar*, [supra, 253 Conn. 306–307]. The court [disagreed with defense counsel and] granted the state's request to admit 'those portions of the [video recording] that [were] inconsistent with [D.L.'s] testimony,' and, at the behest of the [defense], the entire [video-recorded] interview eventually was admitted and shown to the jury . . . ." (Footnotes altered.) *State* v. *Carrion*, supra, 128 Conn. App. 50–51. On cross-examination, D.L. denied the truth of many of the statements that she had made during the interview.[14]

The following principles guide our analysis of the defendant's claim. "It is well settled that . . . [a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . In *State* v. *Whelan*, supra, 200 Conn. 753, however, we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided. . . . In addition to signed documents, the *Whelan* rule also is applicable to tape-recorded statements that otherwise satisfy its conditions."[15] (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 641–42, 945 A.2d 449 (2008).

"[The] *Whelan* . . . hearsay exception [applies to] a relatively narrow category of prior inconsistent statements . . . [and is] carefully limited . . . to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility. As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true in fact. But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances. Consequently, once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible." (Emphasis omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 306.

A party seeking to exclude a *Whelan* statement, however, may make a preliminary showing of facts demonstrating that the statement was "made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness." Id. If a party makes such a showing, the court should hold a hearing to determine whether, "in light of the circumstances under which the statement was made . . . the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process." Id., 307 and n.27. Because this is a demanding standard, "it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." Id., 307.

"[T]he trial court's decision [on the admissibility of a *Whelan* statement] will be reversed only [when] abuse of discretion is manifest or [when] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). "Of course, the trial court's factual findings on this issue will not be disturbed on appeal unless they are clearly erroneous." *State* v. *Mukhtaar*, supra, 253 Conn. 307 n.26.

In evaluating the reliability of statements made by a child who is the subject of a forensic interview, this court has recognized that, because "[y]oung children are sensitive to the status and power of their interviewers and as a result are especially likely to comply with the implicit and explicit agenda of such interviewers . . . [c]hildren . . . are more willing to go along with the wishes of adults and to incorporate adults' beliefs into their reports. . . . A critical finding of psychological research is that young children, particularly preschool age children, appear to be more suggestible as a basic psychological characteristic than older children and adults." (Citation omitted; internal quotation marks omitted.) *State* v. *Aponte*, 249 Conn. 735, 750–51, 738 A.2d 117 (1999); see also *Washington* v. *Schriver*, 255 F.3d 45, 57 (2d Cir. 2001) (improper interviewing techniques "can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events" [internal quotation marks omitted]); *State* v. *Michaels*, 136 N.J. 299, 309, 642 A.2d 1372 (1994) ("[T]he 'investigative interview' is a crucial, perhaps determinative, moment in a child-sex-abuse case. . . . If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events."

[Citations omitted.]). Courts have identified the following nonexclusive factors, among others, as particularly salient in determining the threshold reliability of a child's disclosure of sexual abuse during a forensic interview: (1) the child's age; (2) the child's actions or use of words outside the normal behavior or lexicon of a child of a similar age; (3) the spontaneity of the child's statements; (4) the extent to which the interviewer investigated alternative sources of the child's familiarity with sex; (5) the interviewer's use of leading or suggestive questions; (6) the nature of the abuse or assault; (7) indications that the child has been coached; and (8) the presence of a parent or authority figure. See, e.g., *State* v. *Merriam*, 264 Conn. 617, 639, 835 A.2d 895 (2003) (identifying certain factors relevant to determination of reliability of child's statements elicited during forensic interview of child); *State* v. *Dollinger*, 20 Conn. App. 530, 541, 568 A.2d 1058 (same), cert. denied, 215 Conn. 805, 574 A.2d 220 (1990); *State* v. *Lanam*, 459 N.W.2d 656, 661 (Minn. 1990) (same), cert. denied, 498 U.S. 1033, 111 S. Ct. 693, 112 L. Ed. 2d 684 (1991); *State* v. *Michaels*, supra, 309–10 (same); *State* v. *Cameron*, 168 Vt. 421, 425, 721 A.2d 493 (1998) (same).

Although some aspects of Alejandro's questioning of D.L. may have been unnecessarily or unduly suggestive, we agree with the Appellate Court that the trial court reasonably concluded that any shortcomings in the manner in which the interview was conducted did not render D.L.'s responses so unreliable that their admission into evidence subverted the fairness of the defendant's trial. For several reasons, we conclude that the trial court reasonably determined that, under *Whelan*, the state was entitled to have the jury view the video recording of the interview. First, notwithstanding Alejandro's periodic use of leading questions, some of her questioning was open-ended and nonleading, and D.L. provided important information that was highly incriminating of the defendant in response to that neutral questioning. For example, in response to questions that were not leading, D.L. stated that the defendant (1) had his pants off during one encounter in which he took off her clothes and touched her inappropriately, (2) warned D.L. that he would "tell on [her] back" if she ever revealed to others what he had done, (3) touched her mouth with his "private," (4) touched her "private" with his mouth, and (5) touched her mouth with his tongue.

Second, D.L. made multiple spontaneous assertions during the interview, which belies the claim that her responses were the product of Alejandro's suggestive interview techniques. For example, after Alejandro asked, "[s]o, [the defendant] and his other brother would do the same thing that you're telling me about," D.L. replied "[u]m-hum," but then continued: "They did this like four times, maybe." Similarly, in response to a question as to where the abuse occurred, D.L. volunteered: "My sister and me used to be together, but I

didn't like it." Furthermore, while Alejandro was explaining that it was important for D.L. to talk about anything new or strange that she had observed with her "private" so "that we can make an appointment with a doctor," D.L. responded by stating: "I did that already."

Third, D.L. corrected Alejandro's impressions of the events in question on several occasions during the interview, further demonstrating that she was not simply providing answers that she thought Alejandro was seeking. Instances in which D.L. did not confirm the facts as framed by Alejandro, despite Alejandro's use of leading questions, included the following: (1) when Alejandro asked D.L. whether the defendant's "pants were all the way off," D.L. responded that they were "[m]ostly off"; (2) when Alejandro asked, "[a]nd then it happened another time when there was no party," D.L. responded, "[n]o . . . [i]t happened . . . at Christmas and fall"; (3) when Alejandro asked, "[n]ow, did [the defendant] ever want you to touch his private with some other part of your body besides your mouth and your private," D.L. answered "[n]o"; and (4) when Alejandro sought to confirm, on the basis of D.L.'s previous statements, that the defendant would touch D.L. in her room, D.L. interrupted Alejandro and stated that it actually had occurred in her brother's room.

Mantell's opinion that Alejandro used suggestive techniques that produced results of a questionable memory was undermined by his own concessions and D.L.'s testimony. As we previously indicated, Mantell identified each of the foregoing three considerations as a factor tending to establish the reliability of a child's statements in response to questioning by a forensic interviewer. Furthermore, although Mantell criticized Alejandro's use of multiple-choice questions, he conceded that the RATAC protocol, which is used in many jurisdictions and by some forensic interviewers in this state, permits the use of such questions. Finally, D.L.'s response to a number of questions in which she explained that she did not know or could not remember the answer further supports the conclusion that her statements were her own and not a mere reflection of what she believed Alejandro wanted to hear.

We conclude, therefore, consistent with the determination of the Appellate Court, that this is not one of those "highly unusual" cases in which a statement that otherwise satisfies the *Whelan* criteria nevertheless is so inherently unreliable that it must be kept from the jury. *State* v. *Mukhtaar*, supra, 253 Conn. 307. Although Mantell identified what he characterized as the coercive effects of Alejandro's forensic interviewing techniques, the Appellate Court correctly concluded that the trial court did not abuse its discretion in determining that D.L.'s interview responses were not so grievously unreliable that the jury should be precluded from conducting

its own assessment of their trustworthiness. See, e.g., id., 308 (declarant's statement to police identifying defendant was admissible under *Whelan* despite his "assertions that he was under the influence of narcotics and felt pressured by the police to make both the statement and the identification"); *State* v. *Hopkins*, 222 Conn. 117, 125–26, 609 A.2d 236 (1992) (declarant's statement to police identifying defendant was sufficiently reliable and admissible under *Whelan*, even though, at time of declarant's statement, she was under influence of pain medication, reminded of criminal charges pending against her, and told that defendant was suspect in case); *State* v. *Hersey*, 78 Conn. App. 141, 147, 151–52, 826 A.2d 1183 (declarant's claims of being under influence of alcohol and "a myriad of psychiatric and other medications" when making statement were insufficient to demonstrate unreliability for purposes of admitting statement under *Whelan*), cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); cf. *State* v. *Simpson*, supra, 286 Conn. 644 and n.13 (trial court admitted statements in video recorded forensic interview of child victim of sexual assault under *Whelan* even though interviewer used leading questions and victim had "mental health problems that required medication and . . . [resulted in her] manipulative and occasionally violent behavior").

Nonetheless, the defendant asserts that, as a general matter, the state should not be permitted to use forensic interviews of children under *Whelan* because there is no effective way to cross-examine the child or otherwise establish the unreliability of the child's statements. Although it may be challenging for a defendant to effectively cross-examine a child witness concerning the extent to which the child's statements to a forensic interviewer were the product of unduly suggestive questioning, the defendant is not without recourse to challenge the trustworthiness of those statements. Most obviously, the defendant may inquire into the child's reasons for making the prior statements, and when, as in the present case, the child's prior statements directly contradict certain aspects of his or her trial testimony, that inconsistency itself could be used to cast doubt on the child's trustworthiness. No less important, the defendant may present expert testimony explaining why, in the expert's view, the questioning of the victim was so suggestive as to undermine the reliability of the victim's responses. This is precisely what the defense did in the present case. At trial, Mantell, the defendant's expert, testified forcefully that Alejandro's interview techniques were so flawed that D.L.'s responses were not reliable. Finally, the fact that the interview was video recorded enhanced the ability of the defense, through the testimony of Mantell, to demonstrate how, in the defendant's view, the suggestive interview techniques employed by Alejandro undermined the reliability of D.L.'s responses to Alejandro's questioning. See,

e.g., *State* v. *Rojas*, 524 N.W.2d 659, 663 (Iowa 1994) ("videotape is more reliable than many other forms of hearsay because the trier of fact [can] observe for itself how the questions were asked, what the declarant said, and the declarant's demeanor"), cert. denied, 514 U.S. 1119, 115 S. Ct. 1981, 131 L. Ed. 2d 869 (1995). We therefore are satisfied that the defense had an adequate opportunity, by virtue of Mantell's testimony, to demonstrate to the jury that it should not credit the statements made by D.L. in response to Alejandro's questioning.

II

The defendant also claims that the trial court improperly instructed the jury that "[t]he state . . . does not want the conviction of an innocent person. The state is as much concerned in having an innocent person acquitted as in having a guilty person convicted." Although the defendant raised this unpreserved claim in the Appellate Court, that court did not reach the merits of the claim because it concluded that the defendant had waived it under *State* v. *Kitchens*, supra, 299 Conn. 482–83. *State* v. *Carrion*, supra, 128 Conn. App. 60; see footnote 5 of this opinion. In the present appeal, the defendant challenges that determination and further argues that the charge was improper and deprived him of a fair trial. We need not address the *Kitchens* waiver issue, however, because, even if we assume, without deciding, that *Kitchens* does not bar the defendant's claim, we conclude that the charge did not implicate the fairness of his trial.

In support of his claim, the defendant asserts that there is a reasonable likelihood that the instruction improperly led the jury to believe that the court was suggesting that the state would not have brought charges against the defendant unless it strongly believed that the defendant was guilty. In particular, the defendant argues that the instruction "improperly bolster[ed] the state's credibility in the eyes of the jur[ors] by placing the trial court's imprimatur on . . . the state's case" and that "the probable effect of the . . . charge was to dilute the presumption of innocence, lower the burden of proof and invite the jury to judge the defendant [on the basis of] the state's supposed good faith, rather than the evidence." We are not persuaded that the challenged instruction entitles the defendant to a new trial.

As we frequently have stated, in evaluating a claim of instructional impropriety, we must view the court's jury instructions as a whole, without focusing unduly on one isolated aspect of the charge. E.g., *State* v. *Delvalle*, 250 Conn. 466, 470, 736 A.2d 125 (1999). In determining whether a jury instruction is improper, "the charge . . . is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the

case." (Internal quotation marks omitted.) Id. In addition, the defendant bears the burden of demonstrating that it is reasonably possible that the jury was misled by the charge. See *State* v. *Lawrence*, 282 Conn. 141, 179–81, 920 A.2d 236 (2007). In the present case, the court's thorough jury instructions accurately informed the jury of the state's burden of proof and the role of the court and the jury. For example, the court cautioned the jury prior to trial that the charging documents were not evidence of the defendant's guilt. The trial court further instructed the jury in advance of the trial that it would be asked to decide "whether the state has proved beyond a reasonable doubt any or all of [the] charges" and that the defendant had no obligation to present any evidence.

In its instructions to the jury at the conclusion of closing arguments, the trial court stated: "My actions during the trial in . . . setting forth the law in these instructions are not to be taken by you as any indication of my opinion as to how you should determine the issues of fact. The court is neutral and, in making rulings, is merely trying to enforce the rules of evidence and trial procedure." The trial court next instructed the jury on the various types of evidence, as well as the testimony of expert witnesses, the defendant, and police officers.

The court thereafter explained the presumption of innocence and the state's burden of proof: "In this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. This presumption of innocence was with this defendant when he was first presented for trial in this case. It continues with him throughout this trial, unless and until such time as all evidence produced here in the orderly conduct of the case, considered in the light of these instructions of law, and deliberated on by you in the jury room, satisfies you beyond a reasonable doubt that he is guilty of an offense. If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of a crime charged, then it is the sworn duty of the jury to enforce the law and to render such a verdict. . . . The burden to prove the defendant guilty of the crimes with which he is charged is on the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute a crime charged."

The court subsequently explained the concept of reasonable doubt and stated in relevant part: "[I]f there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted." Following its explanation of these general principles, the court instructed the jury

on the elements of the specific charges. In doing so, the court reminded the jury more than twenty times that, to find the defendant guilty of a crime, the jury must determine that the state had proven the existence of every element of the crime beyond a reasonable doubt. The trial court then stated: "Please understand that, if I pointed out certain evidence during the course of these instructions, that was only to illustrate how you might go about relating the evidence you have heard to the instructions on the law."

Only after instructing the jury in this manner did the trial court state as follows: "The defendant justly relies on you to consider carefully all of the evidence and to find him not guilty if the facts and law require such a verdict. *The state as well does not want the conviction of an innocent person. The state is as much concerned in having an innocent person acquitted as in having a guilty person convicted.* At the same time, the state does look to you to uphold the law and to render a verdict of guilty if the facts and law require such a verdict." (Emphasis added.)

A fair reading of the trial court's entire jury charge reveals that, contrary to the defendant's claim, it is not reasonably possible that the challenged language improperly led the jury to believe that the court was vouching for the state. The trial court did not instruct the jury that the state only prosecutes guilty people; the court asserted, rather, that the state does not desire the conviction of an innocent person. When viewed in the context of the entire charge, it is likely that the contested instruction merely served to underscore the state's burden of proving the defendant guilty beyond a reasonable doubt and that only if the state did so could the jury find the defendant guilty. Consequently, the defendant has not demonstrated that the charge deprived him of a fair trial.[16]

We do agree with the defendant, however, that the challenged language, when viewed in isolation or unsupported by instructions such as those given in the present case, potentially could be misconstrued to suggest that the state does not bring charges against innocent individuals and, therefore, that the defendant must be guilty. Insofar as the instruction may be interpreted as informing the jury of the subjective beliefs of the state, those beliefs are not a proper consideration for the jury. We therefore share the view, expressed repeatedly by the Appellate Court, that, because the charge "possibly is susceptible of an unacceptable interpretation . . . [it should] be omitted from all jury instructions in the future." *State* v. *Wilson*, 71 Conn. App. 110, 120–21, 800 A.2d 653, cert. denied, 262 Conn. 905, 810 A.2d 272 (2002).[17] We think that this admonition is particularly appropriate because, although the instruction is intended to *aid* the defendant by highlighting the fact that the presumption of innocence and the state's heavy

burden of proof are designed to ensure that only guilty persons are convicted, the charge possibly might be misunderstood to undermine these principles. Accordingly, we exercise our supervisory authority over the administration of justice to direct that our trial courts refrain from giving the challenged portion of the charge. Because, however, the instruction did not violate the defendant's right to a fair trial, his claim must fail.

Finally, we take this opportunity to address the concerns expressed by Justice Zarella in his concurring opinion with respect to the use of our supervisory authority in the present and similar future cases. As Justice Zarella acknowledges, in *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014), we recently explained that the cases in which this court has invoked its supervisory authority "can be divided into two different categories. In the first category are cases [in which] we have utilized our supervisory power[s] to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing convictions or portions thereof. In the second category are cases [in which] we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal. Although we recently have noted that, '[o]ur cases have not always been clear as to the reason for this distinction'; *State* v. *Diaz*, 302 Conn. 93, 107 n.11, 25 A.3d 594 (2011); a review of the cases in both categories demonstrates that, in contrast to the second category, the first category consists of cases [in which] there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future." *State* v. *Elson*, supra, 768–69 n.30. Of course, the present case falls into the first category.

According to Justice Zarella, "the invocation of supervisory authority in [these two types] of cases should be governed by the same limiting principles. That is, in every case in which this court considers whether to invoke its supervisory authority, the court should consider (1) whether traditional protections are adequate to ensure the fair and just administration of the courts, and (2) whether the issue presented affects the perceived fairness of the system as a whole." Consistent with this assertion, Justice Zarella also expresses the view that the use of our supervisory authority in both categories of cases constitutes an "extraordinary remedy," to be invoked only in rare circumstances, "regardless of whether an individual defendant's conviction is reversed."

We disagree with Justice Zarella that the same stringent standard applies both to cases, like the present one, in which we adopt a prophylactic rule for future cases only, and to cases in which we reverse a convic-

tion in the exercise of our supervisory authority in order to avoid an injustice. For purposes of the second category of cases—cases in which we reverse a conviction—the defendant must establish that the invocation of our supervisory authority is truly necessary because "[o]ur supervisory powers are not a last bastion of hope for every untenable appeal." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). In such circumstances, the exercise of our supervisory powers is "an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) Id. Because "[c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system," this court will invoke its supervisory powers to reverse a conviction "only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009). This demanding standard is perfectly appropriate when we are asked to reverse a conviction under our supervisory powers.

The first category of cases, however, presents an entirely different set of circumstances. We invoke our supervisory authority in such a case, as we do here, not because the use of that authority is necessary to ensure that justice is achieved in the particular case. Rather, we have determined that the defendant in that case received a fair trial and therefore is not entitled to the extraordinary remedy of a new trial. Nevertheless, it may be appropriate, in such circumstances, to direct our trial courts to conduct themselves in a particular manner so as to promote fairness, both perceived and actual, in *future* cases. As we tacitly have recognized by invoking our supervisory authority in such cases, because we are not imposing *any* remedy in the case—let alone the extraordinary remedy of a new trial—there is no need for this court to justify the use of extraordinary measures prior to exercising its supervisory authority. Rather, as we explained in *Elson*, we are free to invoke our supervisory authority prospectively when prudence and good sense so dictate. See *State* v. *Elson*, supra, 311 Conn. 769 n.30 (explaining that this court's exercise of its supervisory authority to articulate prophylactic procedural rule for future cases is appropriate when such rule "might well avert . . . problems in the future").

Thus, we frequently have invoked our supervisory authority to direct our trial courts to follow certain

procedures in the future, and many of these cases involve jury instructions. We did so most recently in *State* v. *Medrano*, 308 Conn. 604, 65 A.3d 503 (2013), in which we invoked our supervisory authority to "direct our trial courts in the future to refrain from instructing jurors, when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial. Instead, we [directed] the trial courts to use the general credibility instruction [concerning] a criminal defendant who testifies." Id., 631; see also *State* v. *Ledbetter*, 275 Conn. 534, 578–79, 881 A.2d 290 (2005) (invoking supervisory authority in requiring jury instruction concerning certain risks of misidentification that are inherent in eyewitness identification evidence), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *O'Neil*, 261 Conn. 49, 74–76, 801 A.2d 730 (2002) (invoking supervisory authority in revising and directing specific version of "Chip Smith" charge in future cases); *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (invoking supervisory authority in prohibiting jury instruction in future cases that "one who uses a dangerous weapon on the vital part of another 'will be deemed to have intended' the probable result of that act and that from such a circumstance the intent to kill properly may be inferred"); *State* v. *Griffin*, 253 Conn. 195, 209–10, 749 A.2d 1192 (2000) (invoking supervisory authority in prohibiting future use of "two-inference" jury instruction); *State* v. *Delvalle*, supra, 250 Conn. 475–76 (invoking supervisory authority to bar use of jury instruction that reasonable doubt is not doubt suggested by "ingenuity of counsel" [internal quotation marks omitted]); *State* v. *Schiappa*, 248 Conn. 132, 168, 175, 728 A.2d 466 (invoking supervisory authority in prohibiting use of jury instruction that requirement of proof beyond reasonable doubt is rule designed "to protect the innocent and not the guilty" [internal quotation marks omitted]), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). Like the foregoing cases, the present case is an appropriate one for us to invoke our supervisory authority so that the risk that the challenged instruction will mislead a future jury is eliminated.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and EVELEIGH and McDONALD, Js., concurred.

[1] The charges against the defendant were based on events that occurred between January, 2005, and March, 2007. Thus, either the 2005 or the 2007 revision of § 53-21 (a) (2) would have been applicable to the defendant's conduct. Because the 2005 and 2007 revisions of § 53-21 (a) (2) are identical, we refer to the 2005 revision in the interest of simplicity. All references to § 53-21 in this opinion are to the 2005 revision.

[2] The trial court sentenced the defendant to a total effective term of thirty years imprisonment, execution suspended after twenty-three years, and ten years probation.

[3] As we discuss more fully hereinafter, in *Whelan*, this court held that a prior written inconsistent statement of a nonparty witness is admissible for substantive purposes if the statement is signed by the declarant, who has

personal knowledge of the facts stated, and the declarant testifies at trial and is available for cross-examination. See *State* v. *Whelan*, supra, 200 Conn. 753. This rule later was expanded to apply to tape-recorded statements that otherwise satisfy the *Whelan* criteria. E.g., *State* v. *Simpson*, 286 Conn. 634, 642, 945 A.2d 449 (2008).

[4] In accordance with our policy of protecting the privacy interests of victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[5] In *Kitchens*, this court held that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, supra, 299 Conn. 482–83. Ordinarily, in the absence of such a waiver, a claim of instructional impropriety is reviewable, even if it was not raised in the trial court, if, inter alia, the claim is of constitutional magnitude. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

[6] See Practice Book § 84-11.

[7] In *Mukhtaar*, this court held that a prior inconsistent statement that otherwise satisfies the criteria for substantive admissibility set forth in *State* v. *Whelan*, supra, 200 Conn. 753; see footnote 3 of this opinion; nevertheless may be inadmissible if it was "made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness." *State* v. *Mukhtaar*, supra, 253 Conn. 306.

[8] Specifically, the Appellate Court concluded that, "[n]ot only was defense counsel given an opportunity to review 'in substance' the court's charge before it was delivered to the [jurors], but the court also afforded defense counsel the opportunity to object to any portion of the charge after the jury instructions had been given. At no time, either before or after the instructions were delivered, did defense counsel object to the specific language . . . challenged by the defendant for the first time on appeal. Moreover, in concluding that defense counsel 'acquiesced in, or . . . engaged in . . . conduct consistent with acceptance of the instruction[s]'; [*State* v. *Kitchens*, supra, 299 Conn. 477]; [the Appellate Court found] it telling that an objection was raised with respect to other aspects of the court's charge, other than the instruction that is . . . claimed to be improper." *State* v. *Carrion*, supra, 128 Conn. App. 60.

[9] On appeal to the Appellate Court, the defendant also claimed that the trial court improperly had consolidated the two informations, one of which was based on his alleged sexual abuse of D.L. in Prospect and the other of which was based on his alleged sexual abuse of D.L. in Waterbury. *State* v. *Carrion*, supra, 128 Conn. App. 54. The Appellate Court rejected this claim; id., 57; and the defendant has not challenged that determination on appeal to this court.

[10] Specifically, Mantell testified that the integrity of the interview was seriously undermined because, among other reasons, Alejandro (1) failed to devote enough time to the rapport building phase of the interview, (2) failed to ensure that D.L. fully understood the rules that Alejandro had established for the interview, (3) may have caused D.L. to say what she thought Alejandro wanted to hear by telling D.L. that two police officers and a social worker were observing the interview, (4) used mostly leading and multiple choice questions, (5) suggested to D.L. that she had her own reasons for talking to Alejandro by asking, "what did you come [here] to talk to me about," (6) established an alliance with D.L.'s mother by asking, "[n]ow, I know that the first person you told was your mom, right," (7) used the anatomically correct dolls to obtain a narrative from D.L. as to what had happened to her instead of using them solely to assist D.L. in elaborating on a prior narrative, (8) failed to ensure that D.L. understood that the dolls represented herself and the defendant, (9) used the dolls in a suggestive manner by posturing them feet and genitals first and, at one point in the interview, pushing a doll toward D.L. when she was unresponsive to a question, (10) failed to question D.L. adequately about her claim that the defendant's brothers also had sexually abused her, (11) failed to determine whether D.L.'s knowledge of sex came from a source other than the defendant, and (12) lied to D.L. by telling her that, if D.L. so requested, Alejandro would not disclose to D.L.'s mother what D.L. had related during the

interview.

[11] The RATAC protocol, which was developed by the CornerHouse Child Abuse Evaluation and Training Center, is named after a mnemonic device for the five phases that the protocol directs forensic interviewers to apply when questioning children: rapport, anatomy identification, touch inquiry, abuse scenario, and closure. See, e.g., J. Anderson et al., "The CornerHouse Forensic Interview Protocol: RATAC," 12 T.M. Cooley J. Prac. & Clinical L. 193, 202 (2010). According to Mantell, the RATAC protocol is used by forensic interviewers in seventeen states, including some interviewers in Connecticut.

[12] For example, D.L. testified on direct examination that the defendant never had touched her body with his mouth and vice versa, and that the defendant had touched her with his penis only one time.

[13] Section 8-5 of the 2009 edition of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial:

"(1) Prior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement. . . ."

[14] For example, D.L. denied both that she had her clothes off when she encountered the defendant and that she and the defendant had engaged in oral contact with one another.

[15] In the present case, it is undisputed that D.L.'s statements in the video-recorded forensic interview satisfied the threshold *Whelan* criteria.

[16] The defendant also contends that the charge entitles him to a new trial under the plain error doctrine. See Practice Book § 60-5 ("[t]he court may in the interests of justice notice plain error not brought to the attention of the trial court"). Plain error review, however, "is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 287–88, 963 A.2d 11 (2009). The defendant's plain error claim fails in light of our determination that the instruction did not undermine the fairness of his trial.

[17] In addition, see *State* v. *Elson*, 116 Conn. App. 196, 225, 975 A.2d 678 (2009) (reaffirming *Wilson*'s admonishment that trial courts should not instruct juries that "[t]he state, as well, does not want the conviction of an innocent person" as "[t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted" [internal quotation marks omitted]), superseded in part en banc on other grounds, 125 Conn. App. 328, 9 A.3d 731 (2010), rev'd on other grounds, 311 Conn. 726, 91 A.3d 862 (2014), *State* v. *McCarthy*, 105 Conn. App. 596, 621, 624–25, 625–26 n.7, 939 A.2d 1195 (concluding that trial court improperly instructed jury that " 'the state does not want to see the innocent convicted' " but finding no constitutional violation and declining to reverse conviction under plain error doctrine or on basis of supervisory powers), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008), *State* v. *Pauling*, 102 Conn. App. 556, 573–76, 925 A.2d 1200 (noting that trial court failed to heed holding in *Wilson* when instructing jury that " '[t]he state is as much concerned [in] having innocent people acquitted as [in] having a guilty person punished' " but concluding that use of such language did not violate defendant's constitutional rights), cert. denied, 284 Conn. 924, 933 A.2d 727 (2007), *State* v. *Marshall*, 83 Conn. App. 418, 431, 850 A.2d 1066 (no constitutional violation when jury was instructed that "[t]he state does not desire a conviction of an innocent person or any person whose guilt upon the evidence is in the realm of reasonable doubt" as "[t]he state has as much concern in having an innocent person acquitted as in having a guilty person punished" [internal quotation marks omitted]), cert. denied, 271 Conn. 904, 859 A.2d 564 (2004), and *State* v. *Torres*, 82 Conn. App. 823, 835–36, 847 A.2d 1022 (jury instruction that "[t]he state, as well, does not want the conviction of an innocent person" as "[t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted" did not violate defendant's constitutional rights [emphasis omitted; internal quotation marks omitted]), cert. denied, 270 Conn. 909, 853 A.2d 525 (2004).